[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-13030
Non-Argument Calendar
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 12, 2006
THOMAS K. KAHN
CLERK

Agency No. A78-344-352

CARMEN E. SANCHEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(January 12, 2006)**

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Carmen Elvira Sanchez Bocanegra (Sanchez), a Colombian national, petitions for review of the Board of Immigration Appeals's (BIA) order, adopting and affirming an Immigration Judge's (IJ) order of removal and denial of her asylum and withholding of removal claims. On appeal, she argues that the IJ's adverse credibility determination was not supported by substantial evidence, and that substantial evidence supported her asylum and withholding of removal claims that she was persecuted on account of her membership in the social group of trained dentists and her political opinion. For the reasons set forth more fully below, we dismiss the petition in part and deny in part.

In her asylum application, Sanchez stated that she was a dentist who, while volunteering her services to the poor, was forcibly taken by guerillas into the woods on more than one occasion to treat their wounded, and if she had refused, she would have been killed. She indicated that she was a member of the political and labor parties, as well as the doctors' union, and had been threatened with rape by both the police and the guerillas if she refused to help them. Sanchez was also threatened for failing to vote for a member of the guerilla party. Sanchez feared that she would be raped and killed if returned to Colombia.

On October 11, 2000, Sanchez signed a second or supplemental application for asylum and withholding of removal, alleging persecution on account of her

membership in a particular social group and political opinion. Sanchez feared that she would be subjected to torture and would be kidnaped by the FARC if returned to Colombia because she was a member of the Liberal party and a doctor, and the FARC previously had forced her to treat their sick and wounded and made threatening phone calls to her.

At a preliminary hearing, Sanchez admitted the allegations charged in the notice to appear and conceded removability. Sanchez testified that she became a Liberal party member in 1997 because she believed in the party's principles of equality, rights, education, and health. After graduating with her dentist's license, Sanchez was required to perform one year of social service, which she chose to do in the town of Tavio, where she previously had participated in a variety of activities as a Liberal party youth member. Sanchez participated in meetings in rural areas located around a local hospital, the purpose of which was to inform the local people of the advantages of being in the Liberal party.

From April 1997, when she joined the Liberal party, until June 1998, Sanchez did mostly campaign-related work for the party. When she began her social service work as a dentist, Sanchez performed the service under the "umbrella" of the Liberal party as well. When asked what she would have done to fulfill her social service requirement if not a party member, Sanchez testified that

3

she could have done it through private channels, the government, or on her own, and since she had contact with the party, she chose to do it that way.

As to the "health brigade," Sanchez testified that it consisted of a doctor, a nurse, a dentist, and a driver, and that they provided medical services to poor people in Tavio. The local hospital would promote the brigade's arrival, and upon arriving, the brigade would gather with the community to discuss how the Liberal party would improve their lives. The brigade went out roughly three times per week, and at each meeting, political literature was disseminated.

Sanchez then testified that she came to the United States because, while providing her social services, she was taken out of her hospital by the FARC. It occurred three times, the first being on August 30, 1998, when four men in plain clothes wielding machine guns directed her to grab her basic instruments and come with them because they needed her services. While treating their wounded, the FARC members requested that Sanchez and other members of the health brigade bring the community people around to the FARC's ideology. After two to three days, the FARC returned Sanchez to the local hospital and warned her that they would be watching to see if she and the brigade would do what they requested.

On December 7, 1998, a different group from the same FARC front arrived at the hospital, and Sanchez knew that they had come to get her. She was again

4

taken into the mountains, where the FARC made her do things that were against her ethical principles, such as inducing abortions of female guerilla members. Sanchez was in the mountains for two days, and the FARC requested that her brigade remove the Liberal party logo from its pamphlets. When she returned to the hospital, Sanchez was afraid to speak out because the FARC had been more aggressive, mistreating her and deriding her for having money and education and being different from them.

Sanchez testified that she could have decided to change her social service location to the private sector, but did not because the FARC had a lot of information on her. At this point, the IJ asked Sanchez why, if she was staying in a location where she actively was defying the FARC's requests to recruit people, she was better off in Tavio as opposed to leaving for a new location. Sanchez stated that she didn't know what would happen if she left, and that she wasn't going to give them what they wanted.

Several months passed without incident, but on July 14, 1999, the FARC again returned to the local hospital, and were more aggressive with her. Upset with the FARC's actions, Sanchez began arguing with a FARC member, demanding that he stop intimidating the townspeople, or else she would not work with him or his people. In response, the man pulled out a gun and pointed it at her head, causing

5

her to be quiet and continue working.  The man began touching her body, including her chest.  Sanchez was returned to the hospital the following day, but the same man who had pulled a gun on her continued to tell her that he had let her live.

When asked why she did not report these incidents, Sanchez testified that only five policemen worked in the town, and they couldn't defend her against hundreds of FARC guerillas.  She testified that she completed her social service in June and returned to Bogota two weeks after the last incident.  She lived with her parents in Bogota, and the FARC began making phone calls to her parents' home there three or four weeks later.  The first caller told her that they needed her to help them recruit people, although the caller was not the same person as the one who had spoken to her in the mountains.  At that time, Sanchez was not working as a dentist, but returned to school for a post-graduate degree in performing root canals.  Sanchez testified that, between her mother and herself, she received approximately seven or eight phone calls from the FARC, all of which were threatening in nature and indicated that they knew where Sanchez lived and was studying.  Sanchez said that the FARC was interested in her for her influence over the people where she worked.

On November 11, 1999, Sanchez reported the phone calls to police in order

6

to show the government the type of psychological pressure she was under, as well as to obtain protection. The police were unable to provide her any protection. Sanchez then testified that, had she stayed in Colombia, the FARC could "take her" at anytime. Because Sanchez had no safety or protection anywhere, she did not try to relocate within Colombia.

On cross-examination, Sanchez explained that she did not leave Tavio after the first FARC encounter because she did not think their interference was sufficient reason to leave behind the objective that she wanted to accomplish there. After the second time, Sanchez felt the same way, and despite the risks, did not want to stop pursuing her objectives.

The IJ rendered an oral decision, first finding that Sanchez was not credible because her actions following the FARC's intrusions into her social work were not consistent with a well-founded fear of persecution, and that no evidence demonstrated the great rapport that she claimed to have had with the community in Tavio or a list of the team members who joined Sanchez there. The IJ further took issue with the fact that Sanchez had deliberately declined to comply with the FARC's requests, but the FARC did not do anything between August 30 and December 7, 1998. The IJ also noted the inconsistency between being physically detained while in the mountains and doing nothing about it, and receiving a few

phone calls while in Bogota and promptly leaving the country.

After comparing some of the inconsistencies between the first and second applications, the IJ found that, assuming the guerillas made contact with Sanchez in the mountains, she did not show her fear by leaving, but instead stayed around to complete her objectives. The IJ gave her the benefit of the doubt on the first incident, but after the more aggressive second incident, the three phone calls in Bogota sparking her fear seemed inconsistent. Next, the IJ found that, at most, what the FARC did amounted to extortion for services and had nothing to do with Sanchez's politics.

Sanchez appealed to the BIA, arguing that the IJ had used the wrong burden of proof and had reached an arbitrary and capricious decision. In her brief to the BIA, Sanchez argued that the IJ had erred by (1) failing to support his adverse credibility finding; (2) failing to consider the doctrine of imputed political opinion; and (3) finding that Sanchez had failed to meet her burden of proving a well-founded fear of persecution.

The BIA issued a <u>per curiam</u> opinion adopting and affirming the IJ's decision. Upon review of the record, the BIA found that Sanchez had failed to meet her burden of proof. It found that Sanchez, as a dentist, was coerced into providing medical services and was threatened and harassed as a penalty for non-

8

cooperation. "Even assuming that the respondent was credible," the BIA could not find that the actions taken against her rose to the level of persecution. The BIA further found that there was no indication that Sanchez was targeted to punish her on the basis of a statutorily enumerated ground and that a guerilla organization's attempt to coerce a person into performing a service did not, without more, constitute persecution on the basis of political opinion. Because Sanchez had failed to meet her burden of proof, the BIA found it unnecessary to determine whether her testimony had correctly been determined incredible. Accordingly, her appeal was dismissed.

We will review only the Board's decision, except to the extent that it expressly adopts the IJ's opinion. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (citation omitted). Insofar as the Board adopts the IJ's reasoning, we will review the IJ's decision as well. Id. (citation omitted).

As a preliminary matter, while Sanchez challenges the IJ's adverse credibility finding, the BIA in this case did not adopt the IJ's adverse credibility determination and, in fact, expressly found that it was unnecessary to address the issue of Sanchez's credibility. Accordingly, the IJ's adverse credibility determination is not before us, and, therefore, we decline to address Sanchez's argument. Al Najjar, 257 F.3d at 1284

9

Secondly, Sanchez argues that she was entitled to asylum and withholding of removal because she was persecuted on account of her membership in the social group of trained dentists. The government argues that Sanchez failed to exhaust her administrative remedies with respect to this argument.

We review subject matter jurisdiction de novo. Ortega v. U.S. Att'y Gen., 416 F.3d 1348, 1350 (11th Cir. 2005). "When our review is limited by statutory conditions, we only 'retain jurisdiction to determine the underlying jurisdictional facts at issue.'" Id. (citation omitted). Pursuant to INA § 242(d)(1), 8 U.S.C. § 1252(d)(1), we may only review a final order of removal if "the alien has exhausted all administrative remedies available to the alien as of right." Thus, we have held that the failure to raise a claim with the BIA prevents us from exercising jurisdiction over it. See Fernandez-Bernal v. Att'y Gen. of the U.S., 257 F.3d 1304, 1317 n.13 (11th Cir. 2001).

Sanchez, in her brief to the BIA, argued that the IJ had erred by (1) failing to support his adverse credibility finding; (2) failing to consider the doctrine of imputed political opinion; and (3) finding that Sanchez had failed to meet her burden of proving a well-founded fear of persecution. Nowhere, in either her brief or her original notice of appeal to the BIA, did Sanchez argue that her membership in the social group of "trained dentists" entitled her to asylum because of

10

persecution on account of that membership. Accordingly, Sanchez failed to exhaust her administrative remedies on this claim, and we dismiss it for lack of jurisdiction.

Finally, Sanchez argues that substantial evidence supports her eligibility for asylum and withholding of removal because she was persecuted and has a well-founded fear of future persecution based on, inter alia, her imputed political opinion. Specifically, she argues that the FARC targeted her because of her specialized dental training and her affiliation with the Liberal party, a group to which the FARC objects, causing Sanchez to be kidnaped multiple times and threatened with sexual assault and death. Sanchez further argues that the BIA erred by failing to find a "nexus" between her persecution and her membership in a social group and imputed political opinion.

To the extent that the BIA's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). The BIA's factual determinations are reviewed under the substantial evidence test, and we "must affirm the BIA's decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar, 257 F.3d at 1283-84 (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a

reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1026 (11th Cir. 2004).

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[1] A "refugee" is:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar, 257 F.3d at 1284. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear"

---

[1] Pursuant to the REAL ID Act of 2005, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General" as if enacted on March 1, 2003. See Pub. L. 109-13, 119 Stat 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C. § 1158(b)(1) and note (1).

that the statutorily listed factor, in this case political opinion, will cause such future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. The INA does not expressly define "persecution" for purposes of qualifying as a "refugee." See INA § 101(a)(42), 8 U.S.C. § 1101(a)(42). However, we have discussed other circuits' holdings that "persecution" is an "extreme concept," requiring more than "a few isolated incidents of verbal harassment or intimidation," or "[m]ere harassment." Sepulveda v. U.S. Attorney Gen., 401 F.3d 1226, 1231 (11th Cir. 2005).

A showing of past persecution creates a presumption of a "well-founded fear," subject to rebuttal by the INS. 8 C.F.R § 208.13(b)(1). A "well-founded fear" of persecution may also be established by showing a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country. 8 C.F.R. § 208.13(b)(2)(i) & (ii). It is "well-established" that the well-founded fear inquiry contains both an objective and subjective component, i.e., the petitioner must be genuinely afraid and that fear must be objectively reasonable. Al Najjar, 257 F.3d at 1289. Furthermore, it is the petitioner's burden to present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." Id. at 1287 (quotation and citation omitted).

The record in this case does not compel a reversal. Sanchez's testimony

13

established that, on three different occasions, separated by intervals of three months and five months respectively, FARC guerrillas forcibly removed her from her post at a hospital in Tavio and coerced her into performing medical services on its members. While Sanchez testified that the guerillas had also expressed an interest in her ability to recruit, and were aware of her Liberal party affiliation, the evidence does not compel a reversal of the Board's finding that their interest in her was "on account of" her ability to provide medical services, and not her political opinion. Each time the guerillas confronted her in Tavio, it was to coerce her to perform medical services and, despite having had the ability to change her service post, Sanchez elected not to do so and actively defied the FARC's requests to help with recruitment. Despite her defiance, the FARC did not retaliate against her based on that refusal, and the one time that Sanchez was threatened with a weapon followed her refusal to continue providing medical treatment. To the extent that the FARC coerced her into performing medical services, that is insufficient, standing alone, to rise to the level of persecution. Cf. I.N.S. v. Elias-Zacarias, 502 U.S. 478, 482-83, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992) (holding that forced recruitment is insufficient to prove persecution "on account of" political opinion).

Furthermore, after Sanchez departed Tavio, she was never again personally confronted by FARC guerillas. Her testimony was that she and her parents

14

received seven or eight phone calls of a threatening nature from the FARC, who requested that she assist in their recruitment efforts due to her influence over the people in the rural village where she had worked the previous year. First, it is noted that persuasive authority from other circuits indicates that "[t]hreats alone generally do not constitute actual persecution; only rarely, when they are so immediate and menacing as to cause significant suffering or harm in themselves, do threats per se qualify as persecution." Vatulev v. Ashcroft, 354 F.3d 1207, 1210 (10th Cir. 2003); see also Mendez-Gutierrez v. Ashcroft, 340 F.3d 865, 869 n.6 (9th Cir. 2003); Boykov v. I.N.S., 109 F.3d 413, 416 (7th Cir. 1997). The threats in this case do not fall within the nature of the threats described in the persuasive authorities. More importantly, however, the threats were not related to Sanchez's political opinion, but rather her ability to exert influence over the villagers with whom she had worked. While the FARC's actions are deplorable, the BIA's finding that they were not targeting Sanchez on account of a statutorily protected ground does not compel a reversal.

As to a well-founded fear of future persecution, Sanchez hedges her case on a finding that her past persecution entitles her to a presumption of a well-founded fear. As noted above, the BIA's finding that she did not suffer past persecution does not compel a reversal, and, therefore, Sanchez is not entitled to the

presumption of a well-founded fear of future persecution. She offered little testimony on this point, although her application for asylum indicated that she was afraid of returning to Colombia because the guerillas knew her to be a member of the Liberal party and would kidnap her and force her to treat their sick and wounded because she is a doctor. It seems unlikely that now, more than five years later, the FARC would still remain interested in Sanchez, especially in light of the FARC's reduced membership, which at the time of the 2003 State Department report, was numbered at 13,500.

Sanchez also argues that she is entitled to relief because of her imputed political opinion, which resulted from her association with the Liberal party. Even assuming an opinion had been imputed to her because of her Liberal party affiliation, Sanchez would have to show that the persecutors both falsely attributed an opinion to her and then persecuted her on the basis of that mistaken belief. Al Najjar, 257 F.3d at 1289. Moreover, she would still have to show a well-founded fear of persecution because of that imputed opinion which, as discussed above, Sanchez has failed to do. Id. Accordingly, the theory of imputed political opinion is of no help to Sanchez.

Lastly, an alien seeking withholding of removal under the INA must show that her life or freedom would "more likely than not" be threatened upon return to

16

his country because of, among other things, his political opinion or membership in a particular social group.  See Mendoza v. U.S. Attorney Gen., 327 F.3d 1283,1287 (11th Cir. 2003); INA § 241(b)(3), 8 U.S.C. § 1231(b)(3).  This standard is more stringent than the "well-founded fear" standard for asylum; thus, because Sanchez was unable to meet the well-founded fear standard for asylum, she is unable to qualify for withholding of removal.

Based on the foregoing, we conclude that the record does not compel a reversal of the BIA's order affirming the IJ's order of removal and denial of asylum and withholding of removal.  We, therefore, deny Sanchez's petition for review in part, and dismiss in part for lack of jurisdiction.

**PETITION DISMISSED IN PART, DENIED IN PART.**